FILED

AUG 4 - 2006

NANCY MAYER WHITTING﹍﹍ ﹍ERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Criminal Number: 06-157 (RJL)** |
| | : | |
| v. | : | **VIOLATION:** |
| | : | **15 U.S.C. § 78dd-2(i)** |
| FAHEEM MOUSA SALAM, | : | **(Foreign Corrupt Practices Act)** |
| | : | |
| Defendant. | : | |

### STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States and defendant FAHEEM MOUSA

SALAM (hereinafter "SALAM") agree and stipulate as follows:

### Introduction

Defendant SALAM is a United States citizen. From on or about October 16, 2004 until

on or about March 24, 2006, SALAM was employed as a translator by a United States

government contractor and lived in Iraq. From a date unknown, but beginning at least by on or

about December 12, 2005, and continuing until on or about March 24, 2006, SALAM engaged in

business transactions with other known and unknown individuals unrelated to his employment as

a translator. The business transactions involved the sale of various items including business

supplies, telephone cards, and food products.

Iraqi Official A (hereinafter, "Official A") is an Iraqi citizen. From a date unknown but

beginning no later than December 12, 2005, until the present, Iraqi Official A has worked in

Baghdad, Iraq. Official A is a senior official with the Iraqi Police, the Iraqi Border Guard, and

the Iraqi Special Police (hereinafter collectively referred to as the "Iraqi Police Force"). Official

A's employment responsibilities included, *inter alia,* the oversight and management of materials

requisitioned for the Iraqi Police Force. Materials requisitioned for the Iraqi Police Force were

acquired on its behalf by the Civilian Police Assistance Training Team (hereinafter, "CPATT"), a multinational organization responsible for purchasing materials for the Iraqi Police Force.

### The Offer to Pay

On or about December 12, 2005 a high-ranking Iraqi Ministry of Interior official introduced SALAM to Official A. The Ministry official informed Official A that SALAM was a translator for a United States contractor in Iraq. During the introduction, the Ministry official suggested to Official A that doing business with SALAM could be "beneficial" to SALAM and Official A. After the Ministry official left, Official A spoke to SALAM alone. During the conversation, SALAM offered to give Official A a $60,000 "gift" if Official A would arrange for the Iraqi Police Force, through CPATT, to purchase from SALAM a large-scale map printer and 1,000 armored vests. SALAM suggested the total cost for the proposed transaction would be $1,090,000 ($90,000 for the printer and $1,000 for each of the vests). Official A listened to SALAM's proposal but stated he needed time to consider the offer.

On or about January 2, 2006, SALAM contacted Official A by telephone to discuss the proposed transaction. In an effort to secure the contract, SALAM offered to reduce the total cost of the armored vests to $800,000 (i.e., $800 for each vest). SALAM added that as a result of the reduction in the cost of the vests, SALAM's "gift" to Official A would be reduced to $50,000.

After the January 2, 2006, telephone call, Official A contacted the Office of the Special Inspector General for Iraq Reconstruction (SIGIR)[1] to report SALAM's conduct. SIGIR officials met with Official A, discussed the matter, and thereafter initiated an investigation.[2]

---

[1] SIGIR is a United States federal agency mandated with the oversight responsibility for the use, and investigation of the potential misuse, of the Iraq Relief and Reconstruction Fund (IRRF). A portion of the IRRF is used to fund CPATT, and to acquire materials for the Iraqi Police Force.

[2] The steps taken by Official A after January 2, 2006, as described herein, were taken at the direction of SIGIR agents.

## The SIGIR Investigation

On or about January 3, 2006, Official A agreed to participate in a consensually monitored telephone conversation with SALAM. SIGIR agents monitored and recorded the conversation. During the conversation, SALAM again requested that Official A arrange for the purchase of the large-scale map printer and the armored vests. In an attempt to finalize the transaction, SALAM suggested he could further reduce the price of the vests and similarly reduced his proposed "gift" to Official A to $30,000.

During the monitored and recorded conversation, Official A requested additional information regarding how SALAM anticipated structuring the transaction. SALAM specified that for contracting purposes, Official A should identify the seller of the supplies as "Al-AQSA Company" or the "ALATAWI Group." SALAM suggested that they could further negotiate the details of the transaction by email. SALAM stated that his email address was f_salam2000@yahoo.com.

On or about February 1, 2006, Official A contacted SALAM via email to notify SALAM that he would arrange for the Iraqi Police Force, through CPATT, to acquire the large-scale map printer and the armored vests. Official A advised SALAM "to be prepared" as the process would move forward.

On or about February 3, 2006, a SIGIR special agent (hereinafter, the "Special Agent"), acting with authorization from CPATT to initiate an undercover operation, sent an email to SALAM posing as a Procurement Officer for CPATT. The Special Agent introduced himself, stated he was directed by Official A to assist with the acquisition of the map printer and the armored vests, and suggested that he meet SALAM in person.

On or about February 5, 2006, the Special Agent received an email from the

f_salam2000@yahoo.com email account. In the email, SALAM suggested that they meet on February 6, 2006, at the Embassy Palace in Baghdad, Iraq.

On or about February 6, 2006, the Special Agent met SALAM at a predetermined location at the Embassy Palace in Baghdad, Iraq. During the conversation, SALAM and the Special Agent negotiated prices for the large-scale map printer and the 1,000 armored vests. SALAM's final offer for the deal was $92,000 for the printer and $600 for each vest. SALAM also offered the Special Agent personally $28,000 to $35,000 to process the contract, depending on the final purchase price of the contract. SALAM wrote down the figures on a piece of paper and handed it to the Special Agent. When the Special Agent asked how the "gift" would be made, SALAM responded that the money could be paid in cash or wired to anywhere the Special Agent desired.

During the February 6, 2006 conversation, SALAM provided information regarding the manufacturer and the series number of the map printer and allowed the Special Agent to inspect a sample vest. The Special Agent concluded the conversation by telling SALAM that he was going to process the transaction for the printer and the armored vests as soon as possible. The Special Agent noted that there were some additional details to be finalized but those could be addressed via email. SALAM agreed and encouraged the Special Agent to process the transaction expeditiously.

On or about February 8, 2006, the Special Agent emailed SALAM and thanked him for meeting with him. The Special Agent noted that he was processing the paperwork and would be in contact soon to obtain additional information to complete the contract documents.

On or about February 8, 2006, SALAM responded to the Special Agent's email and requested that the process be expedited. SALAM suggested that they meet for coffee to finalize

the transaction.

On or about February 15, 2006, SALAM and the Special Agent met for a second time at the Embassy Palace in Baghdad, Iraq. During the conversation, they again agreed on the same sale price for the printer ($92,000) and the armored vests (approximately $600 per vest) and a "gift" to the Special Agent in the amount of $28,000 to $35,000, depending on the final purchase price of the contract. The Special Agent requested that he receive some money immediately for processing the paperwork. SALAM stated he could give him $100.00 upon the completion of the paperwork and would provide the additional funds after the transaction was complete.

On or about February 16, 2006, the Special Agent received an email from SALAM. The email stated SALAM would not be able to go forward with the transaction. No information was provided regarding the reason for the decision, and the transaction was not finalized.

As a result of the facts as set forth above, SALAM admits that he is a U. S. citizen and that he acted corruptly in offering and promising to pay Official A, a foreign government official, a sum of money for the purpose of influencing Official A to use his official capacity to influence and to direct business to SALAM.

5

## **DEFENDANT'S ACCEPTANCE**

I have read every word of this Statement of Offense. Pursuant to Fed. R. Crim. P. 11,

after consulting with my attorney, Tony Axam, I agree and stipulate to this Statement of Offense.

Date: _Aug 4ᵀᴴ 2006_          _____
                                              Faheem Mousa Salam
                                              Defendant

I have discussed this Statement of Offense with my client, Faheem Mousa Salam. I

concur with his decision to stipulate to this Statement of Offense.

Date: _8/4/06_          _____
                                     Tony Axam
                                     Attorney for the Defendant

6